17 N.J. Super. 109 (1951)
85 A.2d 529
THEODORE AMO, AN INFANT, BY HIS GUARDIAN AD LITEM, IVAN J. AMO, IVAN J. AMO AND VIOLET J. AMO, INDIVIDUALLY, BEULAH LEADBITTER AND HAROLD LEADBITTER, PLAINTIFFS-RESPONDENTS,
v.
VITO GENOVESE AND PHILIP GENOVESE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1951.
Decided December 21, 1951.
*110 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. Joseph F. Mattice argued the cause for appellants.
Mr. Huyler E. Romond argued the cause for respondents (Messrs. Toolan, Haney & Romond, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
"We must never forget that courts exist for the sole purpose of rendering justice according to law. No eagerness to expedite business, or to utilize fully the court's time, should be permitted to interfere with our high duty of administering justice in the individual case." Pepe v. Urban, 11 N.J. Super. 385, 389 (App. Div. 1951).
We may suppose that the objects of the law are the same today as they were in the most rudimentary stages of its growth. Whether we think of the days when the prevalent thought was that might makes right or of the modern times when human insight and rationalization are regarded to be much more acute in the accomplishment of the purposes of the blind goddess, we cannot escape the conclusion that the object of all social laws is that the members of society shall be accorded the benefit of speedy, complete and exact justice.
It is exceedingly desirable, if not imperative, that in the *111 disposition of the modern quantity of litigation, expedition must supplant languor, but never at the expense of justice.
It remains true today that in the domain of the courtroom the judge is the center of power and authority, yet it must be apparent to one familiar with the atmosphere of a courtroom that written rules of procedure cannot be made sufficiently specific to fit all of the various emergencies of particular cases. In such exigencies, since the judge is nevertheless bound to act, he must not dedicate his attention so much to what is the most nimble and expeditious thing to do but rather to what is the fair, just and reasonable thing to do, and in so acting he exercises that power of decision designated as "judicial discretion."
In considering the subjects of "judicial discretion" and its less familiar companion "abuse of discretion," attention is invited to our recent decision in Smith v. Smith, 17 N.J. Super. 128 (App. Div. 1951), wherein we stated:
"Judicial discretion is an indispensable ingredient of judicial power. The trial judge must be invested with the magistracy of the courtroom procedure. Among his powers, yes duties, are those of presiding, of preserving order and decorum, of regulating the conduct of those who participate in the proceedings, the granting of continuances, and of so supervising the trial that there may be such economy of time, effort and expense as is commensurate with the rights of the parties to present their claims and defenses.
It has been said that judicial discretion is that discretion which is not and cannot be governed by any fixed principles and definite rules because the possible eventualities to be dealt with in the exercise of that power cannot be specifically catalogued. Such a definition obviously offends accuracy. Chief Justice Marshall in his decision rendered in Osborn v. U.S. Bank, 9 Wheat. 738, 866, 6 L.Ed. 204 (1824), stated: `Judicial power is never exercised for the purpose of giving effect to the will of the judge; always for the purpose of giving effect * * * to the will of the law.'
Lord Mansfield had said in Rex v. Wilkes, 4 Burr. 2527, that judicial discretion `means sound discretion, guided by law. It must be governed by rule, not by humour. It must not be arbitrary, vague and fanciful, but legal and regular.'
Perhaps a more accurate composite definition is that `judicial discretion' is the option which a judge may exercise between the doing and the not doing of a thing which cannot be demanded as an absolute legal right, guided by the spirit, principles and analogies of *112 the law, and founded upon the reason and conscience of the judge, to a just result in the light of the particular circumstances of the case. 23 Words & Phrases 278; Brandon v. Montclair, 124 N.J.L. 135 (Sup. Ct. 1940), affirmed 125 N.J.L. 367 (E. & A. 1940); Beronio v. Pension Commission of Hoboken, 130 N.J.L. 620 (E. & A. 1943); Hoffman v. Maloratsky, 112 N.J. Eq. 333 (E. & A. 1933).
And so it is universally recognized that the authority to exercise judicial discretion is not an arbitrary power of the individual judge, to be exercised when, and as, his caprice, or passion, or partiality may dictate, or forsooth as his vindictiveness or his idiosyncrasies may inspire."
Since the action of the judge, the reasonableness and justice of which we are asked to review, was within the category of judicial discretion, we must necessarily consult the circumstances amid which his determination was rendered. We speak only of the circumstances which according to the record before us were imparted without contradiction to the judge and in the light of which he made his ruling.
Chronologically stated, on December 15, 1950, the complaint containing nine separate counts was filed in this action in which the several plaintiffs sought the recovery of compensatory damages from the defendants. The action arose out of the occurrence of an automobile collision. An answer in denial of the alleged negligence was filed on behalf of the defendants by the law firm of Carpenter, Gilmour & Dwyer at the instance of Preferred Accident Insurance Company of New York, the defendants' liability insurance carrier. On April 13, 1951, the pretrial conference was conducted in which a representative of the stated law firm participated for the defendants and at which May 1, 1951, was designated as the date for the trial of the action.
It is said that in the latter part of April, 1951, the defendants' attorneys informed the attorneys for the plaintiffs that the insurance company was insolvent and about to be liquidated and that they had been instructed to cease their services for the company. On or about April 27, 1951, this information was imparted to the judge by the attorneys for the plaintiffs and the date of trial was thereupon postponed until May 22, 1951.
*113 It was not until May 12, 1951, however, that the law firm by letter informed one of the defendants of the insolvency of the insurance company and that the defendants should either personally retain them to conduct the defense or engage other counsel to represent them at the trial to be held on May 29, 1951.
Again it was at the instance of the attorneys for the plaintiffs that on May 17, 1951, the date of trial was deferred until May 29, 1951, and notice of the postponement was dispatched to the defendants.
We understand that on May 25, 1951, the defendant Vito Genovese acquainted Mr. Pillsbury of the law firm of Roberts, Pillsbury, Carton & Sorenson with his predicament. Mr. Pillsbury communicated by telephone with a representative of the Carpenter firm and ascertained that the latter would represent the defendants in consideration of a preparation fee of $150 and a trial fee of $150 per diem. On May 28, 1951, Mr. Pillsbury, evidently acting as a friend of the defendants, informed the judge of the situation. On the same day the defendants were informed by the Carpenter firm that they could not represent them and advised them to retain other counsel.
The defendant Vito Genovese thereupon sped to the office of Mr. Mattice of Asbury Park where he arrived at about 3:00 P.M. Mr. Mattice forthwith communicated with a member of the Carpenter firm and received confirmation of their withdrawal from the case and learned that the office file was being mailed to the home of one of the defendants at Atlantic Highlands. Incidentally we observe that the envelope containing the file was postmarked at Jersey City at 7:00 P.M. that evening.
It was in this posture of the circumstances that Mr. Mattice appeared for the defendants on the morning of the following day and, conscious of his ignorance of the reports of the investigators and physicians of the defunct insurance company comprising the details of the case which it had engaged to *114 defend, he requested a short postponement of the trial to enable him to conduct the defense.
The request was denied and the attorney for the plaintiffs was directed to proceed. This undefended trial resulted in an aggregate award and consequent judgment of $14,250 damages against the defendants.
We recognize the dutiful and praiseworthy efforts of the trial judges so to decrease the number of pending actions that all litigants shall be afforded the opportunity of a prompt trial, but this very commendable object must not be attained by means more enthusiastic than discreet.
The present action could not reasonably be characterized as an "old case." The answer was filed on February 5, 1951; the pretrial conference was held on April 13, 1951; the trial date was initially set for May 1, 1951, and ultimately designated as May 29, 1951. This, we think, is an example of diligent expedition for which the trial judge is well known.
Obviously the basic complication which was delaying the trial was not the dilatory or apathetic attitude of the defendants but the insolvency of the insurance carrier.
There were at least two alternatives available to the trial judge: the one, to insist that the trial of an action involving a controversial issue of negligence with claims for unliquidated damages which had been at issue only 45 days proceed unresisted and unopposed, or to grant a postponement of a few days upon terms that the defendants reimburse the plaintiffs for the expenses incurred by reason of the needless attendance of their witnesses. The adoption of the former alternative in the surrounding circumstances of this particular case was manifestly an inappropriate, unwarranted, and indeliberate exercise of judicial discretion. "Too much haste manages everything badly."
The judgment is reversed and a new trial directed. No costs.