74 N.J. Super. 257 (1962)
181 A.2d 184
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HARRY JOSEPH KAISER AND SUSAN KAISER, DEFENDANTS-APPELLANTS, AND EDNA KAISER, ET AL., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 26, 1962.
Decided May 14, 1962.
*259 Before Judges PRICE, SULLIVAN and LEWIS.
Mr. Abraham J. Slurzberg argued the cause for appellants (Mr. Benedict E. Lucchi, attorney; Mr. Slurzberg, of counsel).
Mr. William C. Brudnick, Assistant Bergen County Prosecutor, argued the cause for respondent (Mr. Guy W. Calissi, Bergen County Prosecutor, attorney; Mr. Brudnick, of counsel and on the brief).
The opinion of the court was delivered by PRICE, S.J.A.D.
Defendants Harry Kaiser and Susan Kaiser, his mother, appeal from judgments of conviction based on the verdict of a jury in the County Court. Indictments were returned against appellants charging them with maintaining a building "as a nuisance" by permitting and by "carrying on knowingly" the "business of lottery or lottery policy" therein, "contrary to the provisions of N.J.S. 2A:130-3"; and with "being the owners of a building" and "unlawfully and knowingly" permitting "the business of lottery and lottery policy, * * * to be carried on by themselves *260 and their agents, contrary to the provisions of N.J.S. 2A:121-3(c)." In addition, appellants, together with Edna Kaiser (wife of Harry Kaiser) and one John White "also known as John Doe," were indicted for "knowingly and unlawfully" possessing "divers papers, documents, slips and memoranda pertaining to the business of lottery and lottery policy, * * * contrary to the provisions of N.J.S. 2A:121-3(b)"; and for conspiring "to knowingly possess papers, documents, slips and memorandum that pertain to the business of lottery * * * contrary to the provisions of N.J.S. 2A:98-1 and N.J.S. 2A:98-2."
As far as the record before us reveals, White was not apprehended by the police and, on May 15, 1961, the opening day of the trial under the aforesaid indictments, a severance was granted as to him on the application of the State. The indictments as to the remaining defendants were "consolidated for the purpose of trial." The jury returned a verdict acquitting defendant Edna Kaiser under the two indictments against her, and convicting appellants on each of the four indictments aforesaid.
On this appeal appellants urge several grounds for reversal of their convictions. They are that (a) defendant's motion for judgment at the close of the State's case (R.R. 3:7-6) with reference to the indictments charging maintenance of a nuisance and possession of lottery papers should have been granted; (b) although no motion was made at the end of the State's case with reference to the remaining two indictments, appellants contend that the State "failed to prove the basic elements of both of these offenses," and we should recognize such failure under the plain error rule (R.R. 1:5-1(a), 2:5); (c) the "verdicts were contaminated by the unwholesome demeanor of Susan Kaiser," hereinafter more particularly described; (d) Susan Kaiser was denied "due process of law," in violation of "Art. 1, Sec. 1" of the Constitution of this State and "the first section of the Fourteenth Amendment to the Constitution of the United States," by "unfairly and improperly" compelling *261 her to stand trial, and by the trial court's action in that regard, allegedly based in part on "matters dehors the record"; and (e) that the trial court failed "to instruct the jury on all the essential questions of law involved in the case."
Resolution of the points raised by this appeal requires a detailed recital of the facts.
On May 12, 1961 defense counsel moved that the case against Susan Kaiser (age 63) be continued "until such time as her condition improves enabling her to withstand the rigors of trial." In support of his motion counsel relied upon the reports of Dr. Solomon Hirsch and Dr. Raphael Gilady, the physician for the County of Bergen. The latter had examined appellant pursuant to court order.
Dr. Hirsch's report, dated April 10, 1961, was as follows:
"Mrs. Susan Kaiser is under medical care for a chronic Pulmonary Emphysema. Because of a superimposed respiratory infection it is dangerous at present to expose her to the elements, or to any stresses and strains such as are encountered in court procedures."
Dr. Gilady's report, dated April 13, 1961 (after reciting in detail the extent of his physical examination of Susan Kaiser on that day, preceded by an outline of her family history and a statement of her complaints), contained his detailed findings, including the following:
"* * * Pulse regular, rate 80, small; * * * Heart  the sounds * * * of fair muscular quality * * * no murmurs; * * * evidence of left ventricular hypertrophy; * * * Lungs  showers of moist rales posteriorly in both lungs from the lower margin of the scapula to the base. The breath sounds, therefore, in that area are impaired. Anteriorly the breath sounds are bronchovesicular and no rales elicted. The costophrenic angles are clear on the right, cloudy on the left. * * * Liver, Gall Bladder, Stomach, Spleen, and Kidneys are not palpable; * * * Muscular System fair. Nervous System intact; Reflexes all hyperactive, nonpathological; * * * Blood Pressure  150/90."
He described his X-ray findings as follows:
*262 "Both pulmonic fields show severely increased lung markings of vessels and bronchi, especially in the bases. In the left lower lobe and costophrenic angles there is total density indicating thickened pleura and fibrosis of the lung. The right costophrenic angle is normal. Heart shows a degree of left ventricular enlargement and an obliterated cardiophrenic angle probably due to bronchiectasis."
Most of the conditions revealed by the electrocardiographic examination were characterized in the report as normal, but certain others lead to Dr. Gilady's conclusion hereinafter set forth.
Additional findings were:
"Blood Count * * * perfectly normal; * * * Urine Examination * * * normal; * * * Blood Chemistry, Serum Cholesterol is elevated to 305 milligrams. (The normal is between 150 to 250 milligrams.)"
Dr. Gilady's conclusions were as follows:
"This woman is suffering from acute pulmonary disease superimposed on chronic emphysema and early bronchiectasis.
She also has a hypercholesteremia. (High serum cholesterol in the blood.)
The electrocardiogram shows definite evidence of myocardial (heart muscle) insufficiency.
She also has a mild hypertension. (Elevation of blood pressure.)
All the above indicates that she is chronically ill and there is no question that the ordeal of the prolonged court procedure would be deleterious to her health. She should particularly not be allowed to come out in inclement weather, because of the acute lung involvement. (The wet lungs  the moist rales in the bases of both lungs.)"
The trial court, after viewing the medical reports and after stressing the many phases of Dr. Gilady's detailed examination which revealed normal physical conditions, concluded that defendant was able to stand trial and denied defendant's application for a continuance. In doing so it stated:
"Under this diagnosis and conclusion if the court were to grant your request, this defendant would never be able to stand trial for the charges against her and the conclusion in the last paragraph is *263 very interesting. She is chronically ill and there is no question that the ordeal of a prolonged court procedure would be deleterious to her health."
The court added that, upon receiving Dr. Gilady's report, it had asked him what he meant by a "long protracted trial," and that Dr. Gilady's response was, "A case that would take three or four or five or six weeks." The record shows that the trial occupied four court days.
On the morning of May 15 the trial commenced as stated, and after approximately one hour had elapsed and during the empaneling of the jury, Susan Kaiser fainted. A Dr. Laytham was summoned and examined her. Upon the conclusion of his examination of defendant he was questioned by the court at side-bar. Defense counsel objected to this procedure and the trial court thereupon permitted counsel to be present but refused to permit him to then question the doctor. At the conclusion of the side-bar conference the judge, addressing himself to the prosecutor and to defendants' counsel, recited his recollection of the substance of his conversation with Dr. Laytham for the record as follows:
"I asked the doctor what her [Susan Kaiser's] blood pressure was. He said it was normal for a woman of her age and that she is nervous and blue as a result of excitement. Her lungs cannot accept and take in the amount of oxygen in the room."
The judge added:
"* * * I have made arrangements to absolutely cool off this room beyond reason.
I am going to say to you [defendant's counsel] for your client[s] that if she feels she cannot continue, to advise the court, and we will cease so that she can regain her composure."
Defendant's counsel responded by moving for a mistrial on the basis that Susan Kaiser did not have the ability to defend herself. The following colloquy ensued:
*264 "I have made a motion previously asking this court for a continuance in this case and I think I was correct when I made the motion. I am convinced now.
The Court: I am also convinced that I was correct when I denied your motion, Mr. Lucchi, and I say that this woman  I feel sorry for her condition under the circumstances  but under your premise now she could never be brought to trial. Her condition is chronic. I don't believe that is the manner of conducting our criminal laws in New Jersey. I feel so sorry for her, but her blood pressure is normal. Her heart beat is normal. She had this condition where excitement makes it impossible for her to get her full amount of oxygen.
Mr. Lucchi: And when she doesn't get that oxygen, your Honor please, from the air, how is she going to confer with me?
The Court: We will stop the proceedings and she may then be able to confer with you.
Is that satisfactory?
Mr. Lucchi: No, sir. it is not.
The Court: Both your motions are denied. Call the jury back."
The State's proofs revealed that about 7 P.M. on July 14, 1960 a police raid was conducted on the premises at 53 Forest Street, North Arlington. The premises were owned by Susan and Harry Kaiser. The former made her home at that address.
State Trooper Kolodzieski testified that the several officers who participated in the raid were in possession of "a warrant to search the premises for suspicion of illegal lottery." Upon arriving at the Kaiser house the front door bell was rung. Receiving no response the officers forced the front door open and Kolodzieski and a fellow officer entered the house. Kolodzieski testified that he saw two persons whom he identified as appellants, walking in a "little hallway * * * in the center of the home * * * from the direction of the kitchen." He testified that he told appellants that "We were members of the New Jersey State Police" and that he also told them that the police possessed a search warrant. Kolodzieski testified that he then went into the kitchen where he found "Edna Kaiser standing at the kitchen table." The witness stated that he there saw "adding machines on the table" in addition to "white envelopes containing white slips of paper with numbers *265 notations on them and another adding machine * * * on the kitchen counter."
After a search of the cellar and first floor of the house, consisting principally of a bedroom, living room, dining room and kitchen, to ascertain whether any other person was present, the witness proceeded to the second floor to search the two bedrooms located there. In one of the upstairs bedrooms was a small table with a telephone and adding machine upon it. Also in the bottom drawer of a chest of drawers were found "bundles of one-dollar bills," totaling $3650. The trooper testified that when he started to count the money Harry Kaiser told him that each bundle contained $50 and that he knew the bundles were of that amount because he had "helped count them and package them."
A closet in the bedroom was searched and found to contain "about twenty empty paper bags" and "sixteen or seventeen canvas money bags," and a strong box in which the sum of approximately $265,000 was found. Appellants, on being interrogated by the officers, denied any prior knowledge of the strong box. State Trooper Michael Beckish, who assisted in the raid and was present at the counting of the money which was confiscated by the officers, testified that "there was a grand total of $275,841.85 found in the house."
State Trooper Paul A. Geczy was assigned "to conduct a search of the kitchen, dining room and pantry of the first floor." He testified:
"* * * In the kitchen I found a large quantity of white envelopes bearing numbers slips, three adding machines, a radio, and in the pantry we found two pink plastic waste baskets containing envelops and adding machine tapes, money wrappers, and we conducted a search of the dining room and we found a quantity of money in the cedar chest and in a china closet in the dining room."
The trooper further testified that 216 of the aforesaid "white envelopes" were found, "containing thousands and thousands of numbers plays, numbers slips, with plays on them * * *." *266 He further said that "the total amount of the bets ran over $12,000.00 for * * * July 14, 1960," the date endorsed on the slips he identified. Other slips, memoranda and records found in the Kaiser home and admitted into evidence were identified by various witnesses as gambling data bearing various dates including "July 12, 13 and 14."
State Trooper Gordon R. Hector participated in the raid and "was detailed to take photographs." Several of the photographs were admitted in evidence and form part of the record on appeal. They depict the rooms in the house and the various items found therein by Troopers Kolodzieski and Geczy as aforesaid.
The record further reveals that, with reference to the results of the search, Trooper Geczy further testified that he "had previous experience with gambling investigations" and that he examined the "thousands and thousands" of slips of paper found in the house "and determined that they were numbers bets."
Walter Spahr, lieutenant of detectives in the Bergen County Prosecutor's office, testified that he had conducted over 1,000 gambling investigations. Based upon the materials found in defendants' house, the witness stated:
"From what is presented there I would say it would be a tally or a counting house, more commonly known as a numbers bank.
The fact that the money and the slips are there would alone, in itself, constitute it as being a bank.

* * * * * * * *
Each item in itself is a bit of gambling paraphernalia, but together it is gambling paraphernalia all coordinated into one."
The remaining witness called on behalf of the State was Arthur Rosenthal, who was engaged in the business of selling store and office equipment. He identified one of the adding machines found in defendants' house as one he had loaned to Harry Kaiser. He explained that the machine in question had been loaned to Harry Kaiser while a defective machine which the latter had recently purchased was being repaired.
*267 Defendants denied any participation in the lottery business. According to defendants' testimony, Harry and Edna Kaiser were merely visiting Susan Kaiser at the time of the raid. Appellant Susan Kaiser testified that in March 1960 she rented one of the upstairs bedrooms to a man named White, who had identified himself as a friend of her deceased husband. She claimed that the lottery paraphernalia belonged to White; that she suspected he was gambling; that she told him so "about a month * * * before the raid"; that he said that "he was gambling but he would get out"; and that "many times" she asked him "to please go before [she] got in trouble." She testified that she had not revealed this information to either Harry or Edna Kaiser. She also stated that the day of the raid was the first time White had done "any work" on the first floor. She maintained that she had not cleaned the rented room during the entire "tenancy" and testified that White "cleaned" it; that no one had cleaned the other upstairs room; and in fact that she "never went upstairs." Her explanation of the presence of the adding machine which Harry Kaiser had borrowed from Arthur Rosenthal was that White asked her to borrow such a machine for him and that she requested the loan thereof from her son. She acknowledged that such request was subsequent to the date when she had "told [White] to leave." She testified that the money found downstairs, approximately $6500, belonged to her.
It was established on cross-examination of Susan Kaiser that, despite the fact that she claimed that she never used the second floor, she had a telephone installed on that floor "about two years ago, maybe more." She admitted that White used the upstairs telephone and paid her "$20.00 each month towards the telephone bill."
In rebuttal of Susan Kaiser's assertion that no one cleaned the unused upstairs room, the State called Trooper Geczy who testified that on the night of the raid, "it was clean and neat and in good order. I would say it was immaculate."
*268 As far as the record discloses, Susan Kaiser experienced no physical discomfort during the course of her direct examination. During cross-examination, however, she made several complaints. While being interrogated concerning the cleaning of the rooms on the second floor of her home she complained of feeling ill. The court excused the jurors and after they left the room the defendant fainted. A recess was taken, followed by a resumption of her cross-examination.
A short time thereafter Susan Kaiser again complained of feeling ill and stated that, "I can't get my mind." After a side-bar discussion, the nature of which is not revealed by the record before us, her examination resumed. Shortly thereafter and before the court adjourned for the day the trial judge answered negatively an inquiry from Susan Kaiser as to whether her interrogation would continue much longer. However, after several more questions were propounded under cross-examination, the witness complained that she did not "know what she was talking about." In response to the court's inquiry she stated that she was "just in a fog since [she] got sick this time" but that "prior" to that time she was "all right." Court was then adjourned for the day.
When court reconvened the following morning the prosecutor in the presence of the jury read aloud the transcript of Susan Kaiser's cross-examination from the point where she had fainted on the previous day. This was done, as expressly stated by the prosecutor in open court, because of Susan Kaiser's aforesaid earlier statement that she was unable to comprehend what she was "talking about." At the conclusion of the reading no attempt was made by the defense to correct any of her previous answers and her testimony remained unchanged.
Cross-examination of Susan Kaiser was then resumed and a complaint that she did not feel "too good" was made by the witness when the prosecutor during the cross-examination inquired as to how she felt. The State suggested a *269 recess, which was granted, and thereafter the cross-examination was continued and concluded.
During redirect examination of Susan Kaiser the transcript of her testimony previously read by the prosecutor as aforesaid was offered in evidence by her counsel and received and marked as an exhibit "on behalf of the defendant."
Harry Kaiser testified that, although he visited his mother "two or three times a day," he "never" saw White. He denied the trooper's testimony that he had counted certain of the "bundles" of money to which reference has heretofore been made.
We perceive no necessity for making any detailed reference to his other testimony, dealing with a variety of collateral matters, or to recite the testimony of other witnesses produced by defendant, as no contention that the verdict was against the weight of the evidence is made. We consider appellants' grounds of appeal in the order hereinabove set forth.

I AND II.
We find no merit in defendants' contention that the court erroneously denied their motion for a judgment of acquittal at the end of the State's case (R.R. 3:7-6). On such a motion the court was obliged "to view the State's evidence in its entirety, giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom." State v. Fiorello, 36 N.J. 80, 90 (1961). It is not required that the State's proofs exclude "every reasonable hypothesis except that of guilt." State v. Graziani, 60 N.J. Super. 1, 13 (App. Div. 1959), affirmed 31 N.J. 538 (1960), cert. den. 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960), cited with approval in Fiorello, at p. 90.
The aforesaid proofs adduced by the State in the case at bar amply support the trial court's action in denying *270 defendants' motion for judgment of acquittal and also make clear that no justification exists for invoking the plain error rule, urged as aforesaid by defendants with reference to the other indictments as to which no such motion was made.

III.
We determine that the contention of counsel for Susan Kaiser that his client's "demeanor" was "unwholesome" and "contaminated" the verdict is devoid of merit. He seeks to support his argument that her own actions justify a reversal of her conviction by presenting the following rhetorical question in his brief:
"How were the jurors to evaluate the fainting spells or the illness of the defendant, when the very action of the trial court in proceeding with the trial after each of the incidents, conveyed to them an impression that the court did not believe that the defendant, Susan Kaiser, was really ill, but rather faking or malingering?"
We find no need to discuss the possible ramifications of sustaining such a contention. Suffice it to say we reject it as a reason for reversal in the instant case.

IV.
Susan Kaiser's assertion that she was denied due process of law is predicated upon the state of her health. It is her contention, as stated in defendants' brief, that the "paramount question" is "whether her health was immediately affected to the degree that her perception and awareness of current events were dulled so that her ability to participate in the presentation of her defense was impaired."
The test of one's ability to stand trial was established by the United States Supreme Court in Dusky v. U.S., 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, 825 (1960). The test there enunciated was as follows:
"* * * We also agree with the suggestion of the Solicitor General that it is not enough for the district judge to find that `the defendant [is] oriented to time and place and [has] some recollection *271 of events,' but that the `test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding  and whether he has a rational as well as factual understanding of the proceedings against him.'"
The question of whether or not an accused should be granted a continuance is a matter within the discretion of the trial court. Annotation: "Continuance of criminal case because of illness of accused," 66 A.L.R.2d 232, 235 (1959); 22A C.J.S. Criminal Law § 485, at p. 99. The above cited authorities recognize that several factors may be evaluated by the trial court in reaching its determination. Among those factors deserving consideration by the court in the exercise of its discretion are medical reports, personal observation of the accused, the effect of a continuance upon the State's ability to produce evidence at a subsequent date, and whether or not the accused will be better able to stand trial at a later time. Of importance to an appellate court, in addition to the above mentioned factors of which a trial court may take cognizance, are the clarity of the accused's testimony at trial and the conduct of the trial court in granting defendant periods of rest whenever the same were requested. State v. Pierce, 175 Wash. 523, 27 P.2d 1087, 1088 (Sup. Ct. 1933).
We find that the trial court did not abuse its discretion in denying defendant's motion for a continuance. The court had for its consideration the medical report of Dr. Gilady and the opportunity to observe Susan Kaiser. The record reveals that during the course of the entire proceedings the court was sympathetic with the defendant's disability and considerate of her needs. At no time during the course of the trial did the defense request a recess in order to confer with Susan Kaiser or to afford her a short period of rest. Moreover, a reading of her testimony reveals that the defendant possessed an acute awareness and a "rational as well as factual understanding of the proceedings" against her. Dusky v. U.S., supra. Her answers were clear in expression and responsive to interrogation.
*272 It is noted that the aforesaid medical report of Dr. Hirsch, produced by Susan Kaiser on her application for a continuance, was extremely brief and couched in general terms. Furthermore, the record shows that appellant's counsel expressly rejected the court's aforesaid offer on the opening day of the trial to recess the proceedings at any time to permit her to confer with her counsel. Moreover, at no time during the trial did she submit any medical evidence that she was physically unable to proceed.
In addition to her contention that the trial court's decision not to grant a continuance was factually unjustified, defendant claims that it amounted to an abuse of discretion for two additional reasons, viz., because matters outside the record were considered by the court, and because the denial of the motion for a continuance was assertively based upon the trial court's alleged fear that Susan Kaiser would never be physically fit to stand trial.
The first reason stems from the trial court's out-of-court conversation with Dr. Gilady, after receiving his medical report, and the refusal to permit oral interrogation of Dr. Laytham after he had examined Susan Kaiser. In support of her contention defendant relies upon two cases involving findings by administrative tribunals, based upon matters outside the record relative to the merits of the substantive issues with reference to which the tribunals were there concerned. Elizabeth Federal Savings & Loan Ass'n v. Howell, 24 N.J. 488, 506 (1957); Mazza v. Cavicchia, 15 N.J. 498, 514 (1954). They are inapposite. They are completely unrelated to the matter with which we are here concerned  whether the trial court abused its discretion in denying Susan Kaiser's application for a continuance of the trial and rejecting her later motion for a mistrial. Under the facts here present we determine that the defendant was not prejudiced by the procedure followed. For the record the court stated its recollection of its conversations with Dr. Laytham and Dr. Gilady. See Shaneyfelt v. State, 40 Ala. App. 13, 109 So.2d 146 (Ct. App. 1958). Defendant's *273 counsel neither objected to Dr. Gilady's oral clarification of his written report, nor did counsel request that he be permitted to examine that doctor. Furthermore, although defendant's counsel requested an opportunity to examine Dr. Laytham, he registered no objection to the court's oral statement of its recollection of Dr. Laytham's findings as expressed by that doctor at the aforesaid side-bar conference at which defendant's counsel was present.
In support of her claim that the trial court's denial of a continuance of the trial was "motivated by over zealousness to move" the trial as scheduled, appellant cites Amo v. Genovese, 17 N.J. Super. 109 (App. Div. 1951), certif. den. 9 N.J. 181 (1952), and Pepe v. Urban, 11 N.J. Super. 385 (App. Div. 1951), certif. den. 7 N.J. 80 (1951). Both cases hold that it is an abuse of discretion to refuse a continuance solely on the basis of expediting the business of the court. As hereinbefore indicated, however, the prospect of an improved ability of the accused to stand trial in the future may properly be considered by the trial court along with other relevant factors. Annotation, 66 A.L.R.2d, supra, at p. 241; 22A C.J.S., supra, at p. 102. We find no indication in the record that the court accorded a disproportionate amount of weight to that consideration.
Appellant Susan Kaiser also claims prejudicial action by the trial court in permitting the prosecutor to read the transcribed portion of her testimony as above stated. We find no error in such action. Initially we observe that defendant interposed no objection to such reading. More importantly, as hereinabove noted, after the prosecutor had read the transcript, appellant's own counsel offered it in evidence and on her application it was received as an exhibit. She may not now complain. "Where an allegedly aggrieved party not only does not object at trial but by his own conduct endorses the action taken, he may not be heard on appeal to label that action as `plain error.' Schult v. H. & C. Realty Corp., 53 N.J. Super. 128, 136 (App. Div. 1958), certif. den. 29 N.J. 279 (1959)." Venuto v. *274 Lubik Oldsmobile, Inc., 70 N.J. Super. 221, 229 (App. Div. 1961).

V.
Our examination of the charge of the trial court reveals no basis for appellants' contention that the court's charge was inadequate.
The record before us discloses ample justification for the jury's verdict as rendered.
The conviction of appellants is affirmed.