**STATE of Delaware, Plaintiff,**

v.

**James E. LANE, Defendant.**

Superior Court of Delaware,
Sussex County.

Submitted: Sept. 30, 1986.
Decided: Oct. 29, 1986.

John M. Sandy, Dept. of Justice, Georgetown, for plaintiff.

Merritt Burke, III of Brown, Shiels & Chasanov, Georgetown, for defendant.

## OPINION

CHANDLER, Judge.

Before the Court is defendant's motion to continue the trial in this case indefinitely because of his poor health. After two evidentiary hearings and considerable thought, I conclude the motion must be denied. In order to make the reasons for my decision as clear as possible, the factual history of this case (even though much of it predates the evidentiary hearings before me) will first be recited.

## THE CHARGES

On April 11, 1983 a Sussex County Grand Jury returned an indictment against the defendant James Lane, charging him with delivery of marijuana, tampering with physical evidence, official misconduct and conspiracy in the second degree. (Docket Item No. 1). Defendant pleaded not guilty to all of the charges and requested trial by jury. (Docket Item No. 6).

These charges grew out of a series of incidents alleged to have occurred during December, 1982 at the Sussex County Correctional Institution ("SCI"). The defendant was a deputy warden at SCI where, it is alleged, he and others conspired to implicate a fellow correctional officer in smuggling contraband, marijuana, into the prison. After an extensive investigation, the April 11 indictment was handed down. There has been significant public interest in, and publicity about, the case.

## THE INITIAL CONTINUANCE

During the fall of 1983 defendant underwent a surgical procedure known as coronary artery bypass. A trial was not scheduled pending a further report on his health. By letter dated March 16, 1984 defendant's treating physician, Dr. Stuart Garner, advised that "court appearances" for the defendant should be "delayed until he is in better medical condition." (Docket Item No. 9). On April 9, 1984, at a hearing on the issue of defendant's physical condition to stand trial, Dr. Garner testified that the defendant could not be exposed to extended periods of travel or to the stress associated with lengthy court proceedings without placing the defendant "at an increased risk" of a heart attack. Dr. Garner's views were reiterated at a later hearing on November 7, 1985 (Docket Item No. 19) and summarized in a letter dated November 8, 1985. *See* Defendant's Exhibit 1 to Docket Item No. 19.

Following the April 9, 1984 hearing, defendant was examined by the State's expert, Dr. Gary T. Quiroga, a specialist in internal medicine. By letter dated December 14, 1984, Dr. Quiroga concurred in Dr. Garner's conclusion, advising that "lengthy[1] court proceedings can precipitate episodes of angina pectoris, and this in turn precipitates serious cardiac rhythm

[1] Counsel for the defendant and the State each expect to call about six witnesses in this case, and predict the trial will take five or six days. Neither Dr. Garner nor Dr. Quiroga were specific about what they considered a "lengthy" trial. Moreover, they apparently were not asked to consider the defendant's ability to withstand a trial structured to afford him maximum rest as well as other precautions. *See* text at page 979 *infra.*

disturbances that can endanger [the defendant's] life." *See* State's Exhibit 1, p. 2, Docket Item No. 19.

Three witnesses, who had seen the defendant driving his automobile as well as performing various other physical tasks at his residence, testified for the State at the November 7, 1985 hearing. Accepting the experts' views and discounting most, if not all, of the testimony by the lay witnesses, Judge Claud L. Tease found the defendant physically unable to withstand the stress of a trial. Based on that finding, Judge Tease continued the trial indefinitely, specifically noting that "if there is no substantial improvement in the health of the defendant within a reasonable time, the charges will be dismissed upon appropriate application by the defendant." *State v. Lane*, Cr.A. No. S83-04-0002, Tease, J. (Nov. 27, 1985) p. 2 (letter opinion). (Docket Item No. 22). No application was ever made to dismiss the charges, however.

## A RENEWED REQUEST FOR TRIAL

Following Judge Tease's November 27 decision, the Deputy Attorney General responsible for the prosecution of this case enlisted the aid of the Delaware State Police. Between February 7 and 12, 1986, Lt. John Perry engaged in undercover surveillance, observing the defendant and his residence from an unmarked police car a short distance away. During the surveillance Lt. Perry took photographs of the defendant. In addition, aerial photographs of the defendant's residence were taken on February 13, 1986. Armed with the evidence from the state police surveillance, the State renewed its demand that this case be scheduled for trial.

## THE AUGUST 18 HEARING

At a hearing on August 18, 1986, Lt. Perry testified that on February 12 he observed defendant shoveling snow continuously for 44 minutes in an area adjacent to his residence. Perry also testified that at that time the temperature outside was 27 degrees Fahrenheit, with a windchill factor of three degrees below zero.[2] Lt. Perry stated that the shoveling was uninterrupted and that he had no doubt it was the defendant he had observed. Aerial photographs confirmed that an asphalt area adjacent to the defendant's residence had been cleared of the approximately one and a half inches of snow that had fallen the night before.

The State next offered the testimony of Alvin Ayers, the father of the young woman whom the defendant allegedly tried to implicate falsely in a drug conspiracy at SCI. Ayers, therefore, has an interest in the case. He recalled driving by the defendant's residence on a hot, muggy day in mid-July 1986 and seeing the defendant shoveling dirt into a wheelbarrow, which he proceeded to push for some distance.

The defendant was absent from the August 18 hearing and his attorney claimed the stress of the hearing would be "more than he can stand." Neither Dr. Garner nor any other medical expert appeared. Since the defendant offered no evidence and the burden of going forward was on him, the hearing was continued until September 30.

## THE SEPTEMBER 30 HEARING

During the September 30 hearing, defendant's counsel called a single witness, Dr. J.E. Cox, an internist at the Dover Air Force Base. Dr. Cox has recently completed three years of residency and is Board eligible, although he is not Board certified. The defendant was Dr. Cox's first patient assignment and, as of the September 30 hearing, had been seen on two occasions.

On August 13, 1986, the defendant saw Dr. Cox for the purpose of renewing certain prescription medicines. On August 18, 1986, coincidentally the same date as the

---

**2.** There was testimony to the effect that defendant was shoveling in an area shielded from the wind, however.

earlier hearing, the defendant appeared for a routine checkup. He informed Dr. Cox that he was experiencing three to four chest pains a day. This indicated to Dr. Cox that there was no change in the quality or frequency of defendant's chest pains. Dr. Cox concluded, therefore, that although defendant was experiencing angina pectoris, his condition nevertheless was stable overall. He continued defendant on the same medications as had been earlier prescribed by Dr. Garner. Based on a review of earlier medical reports, Dr. Cox further testified that defendant's heart function is good, although he has obstructions in the arteries and documented heart disease. He agreed with Dr. Garner's general conclusion that exposing the defendant to a lengthy trial would increase the risk of angina pectoris and possibly lead to cardiac arrythmia.

Under cross examination, however, Dr. Cox admitted "confusion" in his own mind when he was advised of defendant's snow and dirt shoveling activities. Although it is not unusual for a heart patient to do as much as he feels physically capable of doing, Dr. Cox thought that strenuous activities of the kind described by Lt. Perry and Ayers should be avoided by a patient with defendant's medical history. Dr. Cox admitted he would advise the defendant to refrain from exertion such as pushing a wheelbarrow in hot weather or shoveling snow during subfreezing temperatures. He could not explain the troubling inconsistency between defendant's alleged chest pains during periods of mild exertion (such as washing the dishes after a meal) and his ability to shovel snow continuously for 44 minutes. Dr. Cox merely stated that different activities cause different stresses in different people. He observed that it is impossible to predict, with any degree of certainty, whether a limited trial would cause defendant to experience angina pectoris or cardiac arrythmia. And he admitted on cross-examination that the defendant has been seen by a staff psychologist or psychiatrist as a result of alleged stresses and "emotional instablility" brought on

by the prospect of a trial. However, Dr. Cox could not offer an opinion whether defendant's angina pectoris, in any sense, is the result of anxiety brought on by the mere prospect of a trial.

In response to questions from the Court, Dr. Cox stated that the defendant suffers from a progressive condition that will worsen over time absent surgical intervention, although he was unsure whether the defendant is a surgical candidate. At the conclusion of his testimony, the following colloquy occurred:

The Court: "What I need to know is whether you can give me a medical opinion, based on your personal observation of Mr. Lane, whether or not he could physically withstand, without serious risk to his life, a trial in this courtroom, given certain [limitations]. Those [limitations] would be the ability to limit the duration of the trial each day, being able to afford him frequent rest periods, and being able to afford him the assistance of a nurse or other advisory medical personnel. Can you give me an opinion?"

The Witness: "I would think that he should be able to undergo a trial under those circumstances as you have outlined. However, if he were to have complaints of chest pain at any time during trial, there will be no way of knowing whether or not it was true angina or— there would just be no way of knowing, and you would be obligated to take it seriously."

## THE LAW

■ Before reaching the merits I should address defendant's contention that Judge Tease's November 27 ruling constitutes the law of the case which may not be vacated or contravened in a subsequent phase of the litigation without a determination that the initial ruling was "obviously incorrect." See Frank G.W. v. Carol M.W., Del.Supr., 457 A.2d 715, 718–19 (1983) (finding abuse of discretion where judge of the same court overruled decision of predecessor in same

case). This contention completely misconstrues the scope and effect of Judge Tease's initial decision. First, the November 27 ruling is interlocutory in nature, not final. Second, it acknowledged the necessity of future rulings. Third, the basis for Judge Tease's ruling, as it is for my own, is factual, and in no sense is the instant ruling a departure from the legal standards announced in the initial decision. Indeed, the legal considerations underlying Judge Tease's ruling are the same considerations applied in this ruling. *See generally State v. Karno,* La.Supr., 342 So.2d 219 (1977) (listing factors to be considered).

■ I view the situation as analogous to cases where summary judgment has been denied by one judge because of a material factual issue and a second judge in the same case, after an evidentiary hearing to resolve the factual issue, issues a final order granting summary judgment. Such a procedure does not violate the doctrine of law of the case; nor does it offend principles of intra-court comity and courtesy. *See Farmer In The Dell Enterprises, Inc. v. Farmers Mutual Ins. Co. of Del., Inc.,* Del.Supr., 514 A.2d 1097, 1099 (1986) (denial of summary judgment by first judge was interlocutory and law of case doctrine does not bar later entry of final order granting judgment, even though final order embraced different legal theory).

■ I have considered various authorities with respect to continuances of criminal proceedings based on the physical health of a defendant. *See generally* Anno., *Continuance of Criminal Cases Because of Illness of the Accused,* 66 ALR 2d 232, 234–62 (1959) and cases cited in Later Case Service, 66 ALR 2d 639–45 (1984); *United States v. Golden,* 4th Cir., 413 F.2d 1010, 1012 (1969); *State v. Karno,* La.Supr., 342 So.2d 219 (1977); *United States v. Sweig,* S.D.N.Y., 316 F.Supp. 1148, 1165–68 (1970). In general, motions for continuance because of illness lie within the discretion of the trial court. *United States v. Keegan,* 7th Cir., 331 F.2d 257, *cert. den.,* 379 U.S. 828, 85 S.Ct. 57, 13 L.Ed.2d 37 (1964); *State v. Boiardo,* N.J. Super., 268 A.2d 55 (1970), *cert. den.,* N.J. Sup., 57 N.J. 130, 270 A.2d 33, *cert. den.,* 401 U.S. 948, 91 S.Ct. 931, 28 L.Ed.2d 231 (1971) (listing factors to be evaluated by court in exercise of its discretion.)

I begin by accepting, as undisputed fact, that the defendant, a 63 year old man, suffers from the disability complained of and that there is an unknowable risk associated with forcing him to stand trial. All of the medical experts agree that the defendant suffers from severe cardiovascular disease. Two experts, Drs. Garner and Quiroga, advise that there are significant risks to the life of the defendant if he is compelled to undergo a lengthy trial. On the other hand, Dr. Cox believes that, with certain limitations regarding the conduct of the trial, the defendant should be able to withstand the stresses of a trial.

In assessing the weight to be accorded the experts' opinions, I have also considered evidence of the unusual character of some of defendant's activities during the past year. Shoveling snow in subfreezing temperatures and pushing a wheelbarrow of dirt in hot, muggy weather are inconsistent, as Dr. Cox admitted, with defendant's claims of severely limited capacity for physical activity. Without the benefit of personal observations, however, it is difficult to draw precise conclusions about the extent to which the defendant may be able to participate during a trial or at associated hearings. Nevertheless, I give complete credit to the testimony of Lt. Perry that the defendant was able to shovel snow on a particularly cold day for 44 minutes, evidence which clearly implies the defendant is more vigorous than he would have the Court believe. Finally, I accord more weight to Dr. Cox's testimony, and less to Drs. Quiroga and Garner, because the observations of defendant on which he relied were more current.

■ While it is hard to conclude that any risks to defendant's life are acceptable, the fact that the condition is chronic suggests

that a trial would be better held now than later. Indeed, where an accused's condition is deteriorating "a determination that the accused is presently unable to stand trial may amount to a decision that he may never be tried." *State v. Karno,* 342 So.2d at 222. Courts have occasionally indicated that where it appeared there was little prospect that the condition of the accused's health would improve if a continuance were granted, the requested continuance should be denied. *See State v. Kaiser,* N.J.Super., 74 N.J.Super. 257, 181 A.2d 184, 193 (1962) *citing* Anno., *supra,* 66 ALR2d at 241.

In the balance also is the public interest in seeing that this matter comes to trial. Although this consideration is not given undue weight in my analysis, it deserves more than the marginal weight defendant accords it. The defendant is charged with official misconduct, an accusation in which there is a strong public interest. Whenever the integrity of public institutions or officials is in issue, courts should weigh very carefully a request that will, as a practical matter, terminate the light of public inquiry.

No expert testified that defendant is physically incapable of assisting counsel, participating in his own defense, or even taking the witness stand should he so choose. There has been no showing that defendant's constitutional right to be present in the courtroom at every stage of his trial will be abridged or diluted if a trial is scheduled, with the limitations discussed later in this opinion.

It is accepted that defendant's heart condition is real and serious. His health problems have existed since at least 1983 when he underwent extensive operative procedures—procedures which admittedly were not entirely successful. In addition, I am acutely aware of the fact that this defendant's prognosis is poor. Having regard for all that is at stake, however, I am of the opinion that the defendant should stand trial. At best, the evidence presented to me has been mixed, with experts under-standably refusing to provide what we all must recognize is unattainable—specific, quantifiable projections about the effects of a trial on an individual's health. What is clear, however, is that the defendant has survived with his physical illnesses on a course of medication since 1983 and is currently stable. It is equally clear that his condition will never improve and that a continued delay of his trial will, in all likelihood, amount to a decision that he will never stand trial. Standing alone, that observation is not conclusive and I hasten to add that it has not been accorded dispositive weight in my analysis. Viewing it in the context of all the other evidence, including evidence of the defendant's physical capacities in his private life and Dr. Cox's unequivocal opinion that the defendant could tolerate a properly structured trial, leads me to believe that a further continuance of this matter must be denied.

The human condition is characterized by uncertainty. We are not omniscient. It is foolish to expect this Court or anyone else to predict the future for this defendant or for other defendants. However, having balanced the considerations and interests at stake, including the defendant's interest in a resolution of the serious charges pending against him, I conclude that a trial must be scheduled.

With the decision to schedule a trial I direct that certain precautions be implemented to avoid, as best we can, all unnecessary risks to the defendant's life. Among these precautions is a direction limited to this case that the court day and week shall be shortened as dictated by circumstances; that recesses during the shortened court day shall be frequent and long; that facilities shall be made available in the courthouse where the defendant can rest and take necessary medicines and food during recesses or at other times if necessary. In addition, the State shall make arrangements for a trained nurse or paramedic to be available at all times during

the trial. Although it is not necessarily an order of the Court at this time, the State should explore with defense counsel the possibility of having the defendant's physician present in the courtroom during all trial and pre-trial proceedings. Defense counsel is also expected to assist the State and this Court in devising measures that will assist in relieving defendant of as much of the stress as possible associated with this trial.

The case scheduling officer is instructed to schedule this matter for trial, mindful of the aforementioned conditions, and to notify counsel of a trial date promptly.

IT IS SO ORDERED.