**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Virgil O. PLATA, Defendant-Appellant.**

**No. 15172.**

United States Court of Appeals
Seventh Circuit.

May 31, 1966.

Rehearing Denied July 8, 1966.

Charles A. Bellows, Sherman C. Magidson, Chicago, Ill., Attorneys for Virgil O. Plata, defendant-appellant.

Jason Ernest Bellows, Chicago, Ill., for appellant.

Edward V. Hanrahan, U. S. Atty., Paul E. Plunkett, Chicago, Ill., for appellee, John Peter Lulinski, Lawrence Jay Weiner, Asst. U. S. Attys., of counsel.

Before HASTINGS, Chief Judge, and KILEY and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

Appellant, Virgil O. Plata, was tried by a jury and found guilty on four counts of an indictment. Count 1 charged that he had in his possession certain plates bearing the impression of a $5.00 Federal Reserve Note with intent to use them in forging and counterfeiting $5.00 Federal Reserve Notes; Count 2, that he made counterfeit $5.00 Federal Reserve Notes; Count 3, that he had in his possession counterfeit Federal Reserve Notes, and Count 5, that he, Francis Hudson and Donald Reidelberger conspired to commit the offenses of making, forging and passing counterfeit Federal Reserve Notes and had unlawfully in their possession plates in the similitude of those from which had been printed the Federal Reserve Notes described in the indictment.

Motions for judgments of acquittal were appropriately made and denied. Defendant's motion for new trial and that in arrest of judgment were overruled by the Court, and defendant was sentenced to the custody of the Attorney General for a term of eight years, under Title 18 U.S.C.A. Sec. 4208(a) (2). From the judgment thus entered the appeal comes to this Court.

Other than the contention that the proof was not sufficient to sustain the judgment, the errors urged as grounds for reversal all relate in one form or another to the claimed erroneous and prejudicial admission of evidence. These contentions embrace the following: (1) that defendant's place of business was searched by government agents without a search warrant, in violation of his constitutional right under the Fourth Amendment, and evidence obtained thereby erroneously admitted against

him; (2) that an alleged incriminatory statement, obtained from defendant by a Secret Service agent while defendant was without the assistance of counsel, in violation of defendant's constitutional right under the Sixth Amendment, was improperly admitted against him; (3) that testimony of the witness Hudson concerning conversations and activities which took place between him and Reidelberger was erroneously admitted for the reason that the proof was not sufficient to show defendant had engaged in a conspiracy with those two parties; (4) that the Court erred in admitting proof of a felony conviction which took place eleven years prior to the return of the instant indictment, and (5) that the Court erred in permitting the government in rebuttal to introduce alleged prejudicial testimony which, if material, should have been introduced during its main presentation.

The issue as to the legality of the search of defendant's premises and the seizure of property found therein, subsequently admitted against him at the trial, was appropriately raised in advance of trial by defendant's petition to suppress. At a hearing thereon, the government sought to justify the search on the basis of a written consent signed by defendant. Defendant admits the signing of the consent but contends that he did so by reason of duress or coercion. Thus, the factual issue before the Court was whether the consent was voluntary, as asserted by the government, or involuntary, as claimed by defendant.

We think a brief statement of the evidence heard at the hearing on the motion to suppress will suffice. On July 22, 1963, at approximately 11:45 a. m., defendant was arrested by Secret Service agents at the McCaw Printing Company, a printing establishment in which defendant and James Cronk were partners. He was taken to the office of John Hanley, Chief of the Secret Service, in the Federal Court Building in Chicago, where he was interrogated by Hanley and other agents. He was told that he was under arrest for counterfeiting and that any statement made could be used against him. Hanley asked defendant if he would submit to a polygraph, to which he responded that he wanted to cooperate but that he would like to talk to a lawyer. Hanley attempted on two occasions to telephone the lawyer suggested by defendant but was unable to reach him. Defendant was asked if he was willing to sign a consent to the search and thus save the time and trouble of obtaining a search warrant. He replied, "Yes, you can search my house, my car and everything." He then read and signed the written consent prepared by an agent. At the time, he admitted he had been advised of his constitutional rights.

At the time of signing, defendant had been held for less than two hours, during which he was photographed, fingerprinted, fed and questioned. There was no proof and it is not contended that during the period of the interrogation he was harassed, and there is no reasonable basis for an inference that he gave his consent because of coercion or intimidation. His own testimony shows that he gave his consent for personal reasons, with the expectation that a search of his premises would do him no harm. In response to the question, "What was the reason behind your signing that paper?" he answered, "The main reason was that I wanted to get back to the office. I wanted to get out of custody. I felt that no search of my premises would produce any evidence and that I was willing to sign the paper and wanted to get out at the office."

The Court in denying defendant's motion to suppress stated, "All of the circumstances in evidence here today, in my opinion, clearly point to the voluntary nature of the consent that this defendant has given. * * * I base my conclusion that it is entirely on the testimony of the defendant himself who appears in support of his own petition."

■ We agree with the conclusion of the Court that defendant voluntarily gave his consent to the search of his premises. It follows that his petition

to suppress was properly denied and that the evidence obtained as a result of the search was not erroneously admitted.

Defendant's second ground urged for reversal relates to the alleged erroneous admission in evidence of a single statement made by defendant during the period he was under arrest. While in custody his person was searched by a special agent and numerous cards were found in his pocket. One card bore the notation, "Reidelberger, EA 7–7679." In response to the agent's inquiry as to who this person was, defendant said, "Friend and customer." It is pertinent to note that the petition to suppress heretofore discussed related only to the evidence obtained as a result of the search of defendant's premises and did not include any evidence obtained from defendant's person or any statement which he made relative thereto. In fact, it is not now suggested that the search of defendant's person was tainted with any illegality. He argues only that his statement of explanation concerning the name "Reidelberger" was obtained in violation of his constitutional right to counsel. As will be subsequently disclosed, this bit of alleged incriminating evidence was a circumstance relied upon by the government in support of the conspiracy count.

We need not extend our discussion on this point because we think it is without merit. As previously shown, defendant had been advised of his constitutional rights, and particularly that any statement he made might be used against him. It is true he had stated that he desired to consult the lawyer who had represented him in business, and admittedly two unsuccessful attempts had been made to reach him by telephone. No request was made that any other lawyer be contacted. We think the inference is inescapable that defendant, with knowledge of his right to counsel and to remain silent if he so desired, voluntarily responded to the agent's inquiry. Defendant's reliance upon Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, is badly misplaced. The circumstances in that case which resulted in a confession to the crime of murder are far removed from those here where the alleged incriminating statement merely identified a person whose name appeared on a card carried by defendant.

Defendant argues that testimony of the witness Hudson, wherein he related conversations between him and Reidelberger and gave a narrative of their activitives, was erroneously admitted. There was no proof that defendant had any conversation with either of these parties or directly had any transactions with them. The propriety of the admission of this testimony was dependent upon whether there was proof by the government of a conspiracy, as alleged in Count 5. The parties are in agreement that the existence of a conspiracy and the defendant's participation in it must be established before any evidence of conversation of co-conspirators outside his presence are admissible against him. It is hardly open to question but that a conspiracy in which defendant was a participant was shown. As the government states in its brief, "The sole question for determination then is whether Reidelberger and Hudson were members of that conspiracy with the defendant."

Broughton, an employee of defendant, although not charged as a co-conspirator in Count 5, was the main witness relied upon by the government to prove that defendant and others were engaged in a conspiracy. Briefly, the witness testified that in April 1963, defendant stated that his "boy" was going to pass the counterfeit bills, that his "boy" was going out east to do so, and that defendant subsequently told him that his "boy" had been out of town to pass the bills and had not been successful. This testimony, buttressed by other circumstances in proof, was sufficient to show that defendant, Broughton and others were engaged in a conspiracy.

The government relies upon circumstantial evidence in support of its theory that Hudson and Reidelberger were shown to be members thereof. It points out that Hudson and Reidelberger went

to New York and other east coast cities in possession of a large quantity of counterfeit $5.00 Federal Reserve Notes in April 1963, the time when defendant stated that his "boy" was going east to pass counterfeit bills; that after approximately two weeks and at the time defendant was discussing the failure of the trip of his "boy," Hudson and Reidelberger returned to Chicago, having passed a very few of the counterfeit bills.

The government points to proof that defendant at the time of his arrest had in his possession, as heretofore discussed, a card bearing the inscription, "Reidelberger," with a telephone number, who he admitted to an agent was a "Friend and customer." There was evidence that Reidelberger and Hudson drove to within a block of defendant's place of business and that while in this area Reidelberger parked his car, was gone for approximately twenty minutes and returned with counterfeit money, a large quantity of which was delivered to Hudson. The latter after his arrest furnished the Secret Service with information as to where a quantity of this money was hidden, which was recovered. It was stipulated that the money thus recovered was identical with that found at defendant's place of business and was, in fact, printed on plates discovered there in connection with the search previously discussed.

Thus, this stipulated evidence appears to connect Hudson and Reidelberger with defendant in a joint venture of making and disposing of counterfeit money. At any rate, it raises a strong inference that the counterfeit money which Reidelberger and Hudson had in their possession and sought unsuccessfully to dispose of not only was obtained from defendant's place of business but was made there. We agree with the trial Court that the testimony of Hudson was properly admitted on the basis that they were all involved in a conspiracy as charged.

■ No good purpose could be served in discussing defendant's contention that the Court erred in permitting the impeachment of defendant by showing that he had been convicted of a felony eleven years previously. On numerous occasions we have heard the argument that such evidence is unfair to a defendant and in some cases works a great hardship. We have sympathy with the argument but, even so, we do not feel disposed to abruptly strike down a rule so long embedded in the law.

■ Defendant's contention that the Court erred in permitting the government to introduce rebuttal evidence as to a conversation between defendant and the witness Broughton has little, if any, merit. Defendant both during direct and cross-examination denied all connection with the government's witness Broughton in the counterfeiting operation. On cross-examination he was asked if he had requested Broughton to take the blame for the counterfeiting charge and if he had promised to take care of Broughton's family in return. Defendant denied such a conversation, and in rebuttal the government recalled Broughton who testified that such a conversation was had while both were in the Federal jail. While we think this evidence might properly have been offered by the government in chief, we also see no impropriety under the circumstances in its admission in rebuttal. It was a matter largely in the discretion of the Court. United States v. Crowe, 7 Cir., 188 F.2d 209, 213; Johnson v. United States, 5 Cir., 207 F.2d 314, 322.

■■ Finally, defendant argues, with force and we think sincerity, that a consideration of the evidence even in the light most favorable to the government leaves a serious doubt as to his guilt. This argument consists in the main of an attack upon the veracity of the government witness Broughton who entered a guilty plea, with imposition of sentence deferred until after he had testified for the government in the instant case. A reading of his testimony reveals that much of the criticism directed at him is justified. On the other hand, there are circumstances in proof which tend to corroborate vital portions of his testi-

mony. A careful review of the record leads us to the conclusion that the case was properly submitted to the jury for an evaluation and resolution of the conflicting testimony. In this connection it is pertinent to note that no question is raised here but that the jury was properly instructed as to its function in the case. We hold that the Court's judgment based on the verdict of the jury must stand.

The judgment appealed from is

Affirmed.