STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
WILLIAM B. PURYEAR, DEFENDANT-RESPONDENT.

Argued November 21, 1967—Decided June 6, 1968.

*Mr. Barry H. Evenchick,* Assistant County Prosecutor, argued the cause for appellant (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

*Mr. Thomas E. Durkin, Jr.,* argued the cause for respondent.

The opinion of the court was delivered by

GOLDMANN, J. (temporarily assigned). The sole question on this appeal is whether a person may be found guilty and

convicted under *N. J. S.* 2*A*:112–3 for knowingly keeping a place "to which persons may resort * * * for gambling in any form," where the uncontradicted evidence was that the place in question was a policy bank or final dropping place for numbers collected elsewhere, and the only activities conducted there were the counting, adding up and recording of wagers made at other locations. The Appellate Division concluded that the proofs at the close of the State's case were inadequate to sustain a conviction and that defendant's motion for judgment of acquittal should have been granted. 94 *N. J. Super.* 125 (1967). We granted the State's petition for certification. 49 *N. J.* 365 (1967).

The matter stems from an investigation by the Newark police emergency squad on November 5, 1962 of a complaint that coal gas was emanating from the second-floor apartment at 500 North 9th Street, Newark. They gained entry by breaking a door pane and reaching in to unlock the door from the inside.[1] Two of the officers entered the apartment wearing gas masks. There was no one there, but they found a number of burning sulphur candles which were promptly extinguished and the place ventilated. Upon observing adding machines and slips which "looked suspicious," the police summoned detectives attached to the gambling squad. Their testimony was that they found three adding machines, lottery slips, pencils, pads, a hat initialed W. B. P., prescription bottles and an automobile driver's license bearing defendant's name, and a cigar box containing, among other papers, a bank book and a gas bill in defendant's name. Later that day defendant was taken into custody under an arrest warrant. In his possession were two keys to the apartment.

Detective Valickas, who qualified as an expert in the investigation of gambling offenses, conceded on cross-examina-

---

[1] Issues relating to the validity of the search and the admissibility of the evidence obtained were resolved in favor of the State by the Appellate Division and are not involved in this appeal.

tion that persons who want to gamble do not go to a place like the 500 North 9th Street apartment to make their bets. In his opinion, the apartment "was being used as the final drop for this here numbers, where they were counted, added up and recorded and was more or less the office of this particular lottery operation." The lottery slips found in the apartment, he said, represented bets which had already been completed and brought there merely for recording or final registration. He characterized the apartment as an "office" whose limited function was the gathering of bets made elsewhere:

"My understanding of a place like this is you have a few people responding to this location or maybe one * * *. All of these packages are picked up from different people when the bets are made. This is the final stop where they are counted and so on."

Captain Manghisi, an expert in lottery investigations, described the apartment as an "office" and said, "I would say no betting is carried on in a place like that." A person wanting to play a number would place his bet with a writer operating in a plant, office building or on the street. The writer, in turn, would put the lottery slips and bets he had collected into a small envelope, sometimes bearing his code initial, and hand it to a "runner" or "pick-up man" making his rounds in a car or on foot. The envelopes so collected would eventually be brought, either directly or through an intermediate drop, to an office or place where the money and slips would be separated. Manghisi said that the amount of play represented by the several collections of lottery slips found in the apartment respectively totalled $1,394.14, $2,413.03, and $1,602.62.

The proofs adduced by the State clearly showed that at no time during the presence of the police in the apartment did defendant make an appearance. No phone calls were received and no one entered the premises to gamble.

500 North 9th Street was owned by Bursam Realty Co., Inc. The records of the local realtor who managed the prop-

erty disclosed that no rents had been collected for the second-floor apartment during 1962. Defendant testified that he was a resident of 49 Delavan Avenue, Newark. He had arranged that one Hamilton Jones occupy the apartment, but he reserved to himself the right to use it "to relax and to entertain." He had observed nothing unusual during the time Jones occupied the apartment. Defendant admitted he had keys to the place, that he was an officer and director of the corporate owner of the building, and that no rent for the apartment had been collected in 1962. He denied having had anything to do with the lottery paraphernalia.

The Appellate Division, reading *N. J. S. 2A* :112–3 strictly, *Neeld v. Giroux,* 24 *N. J.* 224, 229 (1957), apparently felt that because bets were not made and accepted at the apartment, defendant could not be found guilty of keeping a place to which persons might resort for the purpose of gambling in any form. This was too restrictive an interpretation of the statute.

In *Carll & Ramagosa, Inc v. Ash,* 23 *N. J.* 436, 445 (1957), a case involving the statute here in issue, this court observed that New Jersey's comprehensive policy against gambling, except where specifically authorized by the people under our State Constitution (1947), *Art. IV, Sec. VII, par.* 2 (compare Constitution (1844), *Art. IV, Sec. VII, par.* 2, as amended), has been clear and of long standing. Our gambling statutes have been broadly construed in the light of the criminal activity they were designed to reach. As Justice Heher noted in *State v. Morano,* 134 *N. J. L.* 295, 299–300 (*E. & A.* 1946), New Jersey has for many years been committed through constitutional prohibitions to an "all embracive" policy against all forms of gambling; he found "the design of the provision against bookmaking [the crime there involved, *R. S.* 2:135–3, as amended; now *N. J. S.* 2A :112–3] is * * * to enforce the general anti-gaming policy." *N. J. S. 2A* :112–3 must be interpreted in that light. And see *State v. Purdy,* 51 *N. J.* 303, 308, 309

(1968); *State v. Hozer,* 19 *N. J.* 301, 308 (1955); *Ames v. Kirby,* 71 *N. J. L.* 442 (*Sup. Ct.* 1904).

The operation at the apartment in question may not have been of a dimension as great as the one involved in *Hozer,* or even the more extensive ones uncovered in recent years by law enforcement authorities, but it had progressed beyond that of a single individual personally accepting bets to an organization large enough to require a central office or bank. The activities carried on in the apartment were an integral part of a gambling operation which reached from the writer through the pick-up man and, finally, directly (or through an intermediate drop) to the office in question.

As was pointed out in the recent report of the President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (1967), *chapter* 7 dealing with "Organized Crime," law enforcement officials are ·in almost unanimous agreement that gambling is the greatest source of revenue for organized crime, ranging as it does from lotteries, such as "numbers," to off-track horse betting, bets on sporting events, large dice games and illegal casinos.

"Most large-city gambling is established or controlled by organized crime members through elaborate hierarchies. Money is filtered from the small operator who takes the customer's bet, through persons who pick up money and slips, to second-echelon figures in charge of particular districts, and then into one of several main offices. The profits that eventually accrue to leaders move through channels so complex that even persons who work in the betting operation do not know or cannot prove the identity of the leader. * * * Organization not only creates greater efficiency and enlarges markets, it also provides a systematized method of corrupting the law enforcement process by centralizing procedures for the payment of graft.

Organization is also necessary to prevent severe losses. More money may be bet on one horse or one number with a small operator than he could pay off if that horse or that number should win. The operator will have to hedge by betting some money himself on that horse or that number. This so-called 'layoff' betting is accomplished through a network of local, regional and national layoff men, who take bets from gambling operations." (at *pages* 188–189)

Defendant argues here, as he did in the Appellate Division, that the operation at 500 North 9th Street was essentially different from that found in such cases as *State v. Flynn,* 76 *N. J. L.* 473 (*E. & A.* 1909); *State v. Clark,* 137 *N. J. L.* 10 (*Sup. Ct.* 1948), affirmed o. b. 137 *N. J. L.* 614 (*E. & A.* 1948); *State v. Sachs,* 69 *N. J. Super.* 566 (*App. Div.* 1961); and *State v. Costa,* 11 *N. J.* 239 (1953). All we have here, it is said, is an "office" which, when in operation, was occupied by no more than one or two persons quietly engaged in recording bets. Lacking is the "heavy cigar smoke, the open beer bottles, the boisterous heckling and laughter of the traditional gambling resort." The colorful picture thus conjured up is that of illegal conduct in the nature of a public nuisance, a common law disorderly house. See *State v. Williams,* 30 *N. J. L.* 102, 104 (*Sup. Ct.* 1862); *State v. Western Union Telegraph Co.,* 12 *N. J.* 468, 488 (1963), appeal dismissed 346 *U. S.* 869, 74 *S. Ct.* 124, 98 *L. Ed* 379 (1953). But what is denounced by *N. J. S.* 2*A*:112–3 is not the keeping of a disorderly house; rather, it is participation in or providing a place for the operation of any form of gambling activity.

Defendant's apartment was a place where persons accepting or transmitting numbers bets came to further an illegal enterprise by the recording of the day's take—a major step in the business of organized gambling made necessary by its size and reach. In view of our almost all-inclusive policy against gambling, any reading of *N. J. S.* 2*A*:112–3 which would permit him to escape from its terms would obviously be so narrow as to effectively emasculate the statute and subvert the legislative purpose.

This court had occasion to deal with a matter directly analogous to the present situation in *State v. Hozer,* above, where Mr. Justice Brennan broadly construed *N. J. S.* 2*A*:112–3 (then *R. S.* 2:135–3) proscribing bookmaking. In that case a police officer was convicted of nonfeasance in office because he knowingly permitted the operation of a headquarters and control center of a widespread gambling

operation involving betting on horseraces. "Sitters" accepted bets at various outside locations, taking bets over the telephone. They neither received nor paid out monies but noted on small tickets the amount of each bet, the name of the horse and the name of each player telephoning the bet. At the close of the day's business they would deliver these tickets to headquarters, and on the following morning go to that place and record from the slips each player's wins and losses on sheets called "horse pads." They would then discard the slips. If a player won, he was mailed a check from headquarters; on occasion, winnings were paid in cash, delivered to the player by messenger. If he lost, he was notified by telephone of the amount of his loss and expected to mail a check to a certain postoffice box or pay cash to a messenger.

Hozer contended that he was entitled to a directed verdict of acquittal on motions made at the close of the State's case and at the close of the entire case because the described activities were neither "bookmaking" nor "the conduct of practices commonly known as bookmaking," denounced by the statute. Justice Brennan, after noting the strong anti-gambling policy prevailing in this State, observed that "The outlying sitters merely worked at the finger tips of the hand which directed and controlled the criminal enterprise." 19 *N. J.,* at *page* 309. Thus, notwithstanding the fact that the factual situation was a novel one and no bets were actually made at the headquarters, he held that Erickson, the man who controlled the headquarters, was a bookmaker and that the activities conducted there constituted "bookmaking" and "bookmaking practices."

Although the present case involves a form of gambling known as the numbers or policy game, and not bookmaking, the statute involved is the same. As in *Hozer,* the number writers and pick-up men worked at the fingertips of the hand of defendant, who controlled the apartment—the clearing house for bets on numbers taken by persons at other lo-

cations and the place where the pick-up men had to resort in connection with the gambling enterprise.

Defendant's conduct being of the type proscribed by the statute, his conviction must be affirmed. The judgment of the Appellate Division is reversed.

*For reversal* — Chief Justice WEINTRAUB and Justices PROCTOR, GOLDMANN, SCHETTINO and HANEMAN—5.

*For affirmance*—None.