111 N.J. Super. 219 (1970)
268 A.2d 55
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RUGGERIO BOIARDO, ANGELO SICA, ANDREW GERARDO, LOUIS DI BENEDETTO, CESAR CERATO, JOSEPH CIPRIANO, TOBY BOYD, JULIA ORSI, BENJAMIN THOMAS, NINO MACCIOLI, CARMINE LIQUORI, NUNZIO SICA, JOHN MALANGA, THOMAS SPERDUTO, MICHAEL DEL GUERCIO, MICHAEL RUSSOMANO, GERALDINO CUSTODI, MICHAEL MAIRONINO, AND JOSEPH SARRECCHIA, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 1970.
Decided July 30, 1970.
*224 Before Judges CONFORD, COLLESTER and KOLOVSKY.
Mr. Patrick M. Wall (of the New York Bar) argued the cause for appellant Ruggerio Boiardo (Messrs. Michael Querques and Harvey Weissbard on the brief; Messrs. Querques, Isles & Weissbard, and Wadden & Dyson, attorneys).
Mr. Samuel D. Bozza argued the cause for appellants Andrew Gerardo, Toby Boyd, Louis Di Benedetto, Joseph Cipriano, Joseph Sarrecchia and Angelo Sica.
Mr. Anthony Ditri argued the cause for appellants Thomas Sperduto, John Malanga, Julia Orsi, Michael Maironino, Carmine Liquori, Michael Del Guercio, Michael Russomano, Geraldino Custodi, Nina Maccioli and Nunzio Sica.
Mr. Michael Salandra argued the cause for appellant Cesar Cerato.
Mr. Myron P. Maurer argued the cause for appellant Benjamin Thomas.
*225 Mr. Robert L. Podvey, Assistant Prosecutor, argued the cause for respondent (Messrs. Richard M. Altman, David S. Baime, Seymour Wishman, Assistant Prosecutors, on the brief; Mr. Joseph P. Lordi, County Prosecutor, attorney).
The opinion of the court was delivered by COLLESTER, J.A.D.
This is an appeal by defendants from their convictions, following a jury trial, of violating the lottery laws of this State and for conspiracy. All 19 defendants were convicted under an indictment charging them with conspiracy to operate a lottery and violate the laws pertaining to the business of lottery between August 5, 1966 and February 3, 1967 in Newark, Bloomfield, Belleville, East Orange and North Arlington, contrary to the provisions of N.J.S.A. 2A:98-1. In addition thereto, 12 of the 19 were convicted on one or more indictments charging them with violations of either N.J.S.A. 2A:112-3 (keeping a place to which persons might resort for gambling in any form) or N.J.S.A. 2A:121-3 (possession of lottery paraphernalia), or both. All of the indictments were consolidated for the purpose of trial.
The evidence presented by the State clearly established that during the period referred to in the conspiracy indictment defendants were engaged in a massive lottery business. The operation terminated on February 2 and 3, 1967 when special agents of the Intelligence Division of the Internal Revenue Service conducted a series of raids at places used as lottery "offices" or meeting places of the conspirators.
At the trial federal agents testified to the activities of defendants during the many weeks they were under surveillance. The testimony revealed that some of the defendants would pick up paper bags (allegedly containing lottery slips and money received from bettors) daily, at various locations or "drops," and take them to one of several lottery offices used in the operation. The bags often were transferred from one car to another, and the cars would be driven over circuitous *226 routes to avoid detection before the betting records and money were delivered to the lottery office.
The agents also testified of their surveillance of some of the defendants in the vicinity of the Ben Thomas Luncheonette and the Altruist Club, both located in Newark, which served as bases of operation and meeting places for the conspirators. The State presented testimony of the details of the raids conducted by the federal officers and introduced in evidence the lottery paraphernalia seized, including lottery slips, numerous adding machines, pads, envelopes, coin wrappers, "cut cards," and cash.
Federal agent Dominic Germano served as an undercover agent during the six-month period before the raids and arrests ended the lottery operation. Pretending to be a waiter employed at a Catskill Mountain resort, he became an habitue of the Ben Thomas Luncheonette, a favorite meeting place for several of the conspirators, which was operated by the defendant Thomas. He testified that he visited the luncheonette on 68 days, often placed bets with defendant Cipriano, and gradually worked his way into the confidence of both Cipriano and Thomas. During his visits he overheard conversations between several of the defendants that referred to the lottery operation. On 42 days he saw defendant Ruggerio Boiardo meet with defendants Andrew Gerardo, Toby Boyd, Angelo Sica, Louis DiBenedetto and others unknown to him, singly or in groups, inside the luncheonette or in the immediate vicinity thereof. On various occasions he witnessed wrapped packages, inferentially containing money, being passed directly to Boiardo or being placed in Boiardo's car by one of the defendants. Agent Germano often drove Cipriano to a service station in Newark which Cipriano used as a base of operation for his lottery book. He said that after he became well known to Thomas and Cipriano they disclosed details of the organized lottery business which was being conducted.
Thomas told Germano that "Boiardo was the boss of the eastern seaboard and that nobody makes a move without his *227 approval," and that Gerardo, DiBenedetto, Angelo Sica and a man named Farina were his lieutenants. Cipriano was more talkative. He too said Boiardo was the "chief" or "boss," and was "the biggest man in the rackets in New Jersey and controls all New Jersey [and] part of New York." He described the organization as being made up of "soldiers, lieutenants and captains" headed by Boiardo; that it had over 400 runners plus pickup men and controllers. He said the "chain of command" was Boiardo, Farina, Gerardo and Boyd, in that order; that Gerardo controlled all the lottery offices and prepared the envelopes for money to be paid out for "hits" (successful plays); that Boyd ran one of the lottery offices; and that DiBenedetto was active in the organization. Cipriano further told Germano that Angelo Sica operated his own book and had over 20 men working for him, was more or less independent but needed Boiardo's permission to operate, and probably paid for the privilege. He also said the "chief" had the power to "get all books together on odds and cut numbers" and insisted that all "hits" be paid off promptly.
None of the defendants testified at the trial or called witnesses in their defense. All defendants except Nunzio Sica and Cesar Cerato concede on this appeal that the evidence presented by the State was sufficient, if believed, to establish the fact that during the period covered by the indictment a conspiracy to operate a lottery and to violate N.J.S.A. 2A:121-3 and N.J.S.A. 2A:112-3 existed. Moreover, all of the defendants with the exception of Nunzio Sica, Joseph Sarrecchia and Benjamin Thomas, who were convicted of one or more of the indictments charging them with violations of the substantive crimes, viz., N.J.S.A. 2A:112-3 and N.J.S.A. 2A:121-3, concede on this appeal that there was sufficient evidence as a result of the searches and seizures which followed the raids and arrests on February 2, 1967 to establish their guilt of the crimes charged.

*228 THE APPEAL OF RUGGERIO BOIARDO
Although Boiardo concedes the State's proofs established that a conspiracy existed he asserts the evidence did not show that he was a part of it. He raises seven points in his brief as grounds for a reversal of his conviction.

POINT I
Boiardo first contends that the trial court erred in permitting Germano to testify as to statements made to him by Thomas and Cipriano concerning Boiardo's connection with the conspiracy. The statements were admitted by the court under the traditional hearsay exception for statements made in furtherance of the conspiracy. Evidence Rule 63 (9) (b). The rule provides:
A statement which would be admissible if made by the declarant at the hearing is admissible against a party if * * * (b) at the time the statement was made the party and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan.
Boiardo asserts that the admission of such testimony constituted reversible error because (A) it violated his Sixth Amendment right to be confronted with witnesses against him, (B) there was no independent proof that he was a member of the conspiracy, and (C) the statements were not made in furtherance of the conspiracy.

A.
Defendant argues that his constitutional right of confrontation was violated because Thomas and Cipriano elected not to take the stand and testify in their own defense and he therefore was unable to cross-examine them as to the truth of such statements. He relies on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 *229 (1968), and Evans v. Dutton, 400 F.2d 826 (5 Cir.1968), probable jurisdiction noted, 393 U.S. 1079, 89 S.Ct. 862, 21 L.Ed.2d 770 (1969), appeal pending 397 U.S. 1060, 90 S.Ct. 1494, 25 L.Ed. 682 (1970). Bruton does not support Boiardo's position. The court there stated that no recognized exception to the hearsay rule was involved in that case and said, "We intimate no view whatever that such exceptions necessarily raise questions under the Confrontation Clause." 391 U.S. 128, 88 S.Ct. 1623, n. 3. Evans v. Dutton is inapposite on its facts because it involved the admission of a hearsay declaration of a co-conspirator made more than a year after the crime was committed. 400 F.2d at 831.
Boiardo would have us equate the right of confrontation with the opportunity for cross-examination. To adopt such a rigid formula would altogether eliminate the use of much hearsay evidence permitted in criminal trials at a time when the judicial trend has been toward a salutary liberalization of hearsay exceptions.
Hearsay exceptions that dispense altogether with the opportunity for cross-examination have long been accepted and utilized in criminal trials without unduly compromising the accused's ability to present a defense. See Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892) and State v. O'Leary, 25 N.J. 104, 113 (1957) (dying declarations); State v. Reddick, 53 N.J. 66, 68 (1968) (business records). Moreover, the particular hearsay exception challenged here has been considered by the United States Supreme Court and our State courts without having been found constitutionally infirm. Lutwak v. United States, 344 U.S. 604, 617-619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); State v. Carbone, 10 N.J. 329, 340 (1952); State v. Yedwab, 43 N.J. Super. 367 (App. Div. 1957), certif. den. 23 N.J. 550 (1957); State v. Cavanna, 70 N.J. Super. 176 (App. Div. 1961), certif. den. 36 N.J. 298 (1962). We cannot be unmindful of this history of judicial approval. Cf. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, decided June 23, 1970.
*230 There being no authoritative decision requiring us to find that the Confrontation Clause invalidates our Evidence Rule 63(9) (b), we decline to so hold. We conclude that the introduction in evidence of hearsay statements made by the co-defendants in furtherance of a conspiracy in which Boiardo was a participant did not violate his Sixth Amendment right to be confronted by witnesses against him.

B.
Boiardo's contention that there was no evidence, independent of the co-conspirators' statements to Germano, which showed that he participated in the conspiracy, is totally without merit. The evidence clearly indicated that the Ben Thomas Luncheonette was a base of operation for the conspirators. Lottery bets were taken there daily by some of the defendants between 9 and 11 A.M. Boiardo was a regular visitor during those hours where he met and spoke with Boyd, DiBenedetto, Gerardo, Angelo Sica, Cerato, and others. He was often referred to by the conspirators as the "boss." Boyd, undisputably a key figure in the conspiracy, often drove to Boiardo's home in Livingston between 8 and 8:30 A.M. On one occasion Germano heard Boiardo tell Boyd to pick him up at his home at 8 A.M. the following morning. On another occasion Boyd told Boiardo, "I finish my run at 5:30." He also heard Boiardo direct Cipriano to make a telephone call for him, and Gerardo inform Boiardo, "They're going to give you the raid treatment * * * the heat is on."
On a number of occasions Germano observed conspirators hand Boiardo slips of papers although Germano was unable to see what they contained. On approximately 20 separate days conspirators placed bags, boxes, and packages in Boiardo's automobile. While Germano and other agents who had the luncheonette under surveillance were unable to determine the contents thereof they were of the type generally found in a lottery operation. When Boiardo was arrested on February 3, 1967 while driving away from the luncheonette *231 a search of his person produced a paper bag from one of his pockets which contained six packets of money, wrapped separately, totaling $2,036. The paper bag was similar in size and shape to one which had been placed in his car earlier that day by one of the conspirators. In another of Boiardo's pockets the agents found a roll of bills wrapped in a rubber band containing $478.
The existence of a conspiracy and a defendant's participation in it must be shown by "proof aliunde" before statements made by co-conspirators out of his presence are admissible against him. Glasser v. United States, 315 U.S. 60, 74-75, 62 S.Ct. 457, 86 L.Ed. 680 (1942); United States v. Plata, 361 F.2d 958, 961 (7 Cir.1966), cert. denied, 385 U.S. 841, 87 S.Ct. 94, 17 L.Ed.2d 74 (1966). We are satisfied that the evidence adduced by the State in this case, excluding the damaging declarations of Thomas and Cipriano, was sufficient to prove that Boiardo was not only a participant in but the leader of the conspiracy.

C.
Boiardo's argument that the statements made by Cipriano and Thomas to Germano were inadmissible because they were not made in furtherance of the conspiracy is also without merit. The basis of his argument is that Germano was a stranger to the conspiracy and not considered by either Cipriano or Thomas as one who might be of help to it, that neither conspirator could have thought that his declarations to Germano advanced the goals of the conspiracy, and that at best their statements were merely gossip. We do not agree.
The life blood of a lottery operation is the regular small bettor, and Germano became such a bettor. We think it was inferable by a jury that the statements were made to Germano to instill in him confidence in the lottery operation and its businesslike efficiency so that he would continue to place his bets with the organization. He was told that there was a "chain of command," that the organization "pays off hits *232 right away, and this is what the chief wants and demands," that "the chief had the power to get all the books together on odds and cut numbers," that independents "can't operate without the chief's approval," and that Boiardo "controls all of New Jersey, part of New York."
The trial court did not err in its conclusion that there was a fact issue as to whether statements by Cipriano and Thomas were made in furtherance of the conspiracy.

POINT II
Boiardo contends that the admission of the hearsay statements discussed in Point I, above, deprived him of his right to a fair trial because they indicated he was a man of bad character who was engaged in other criminal activities. He alleges that they did more than portray him as the prime mover of the conspiracy because they depicted him as the "boss of the eastern seaboard," the "big boy" in the "organization," one who had numerous "exploits in the rackets," the biggest man in the rackets in this State controlling not only all of New Jersey but parts of New York as well, and that he was a man "whose word could get a guy knocked off." He argues that such references to his character were irrelevant and so grossly prejudicial as to compel a reversal.
Evidence of other offenses, wholly independent of the one charged, is generally inadmissible. However, here the statements were evidence of Boiardo's position in the conspiracy for which he was being tried and indicated the power that he wielded therein. It was permissible for the State to show that Boiardo was the leader of the conspiracy, that he controlled the "rackets," including lottery, and that the conspiracy involved an organization made up of "soldiers, lieutenants and captains" headed by this defendant. Such was the very structure of the conspiracy.
While it may be arguable that some of the references to this defendant were unduly damaging to him as against their weight in evidencing the conspiracy, we do not consider *233 them sufficiently prejudicial to warrant a reversal because the record fairly shrieks of defendant's guilt. A defendant is entitled to a fair trial but not a perfect one. At most the admission of such statements was harmless error. See Lutwak v. United States, supra, 344 U.S. at 619, 73 S.Ct. 481.

POINT III
Boiardo argues that his motion for a judgment of acquittal should have been granted by the trial court. He concedes that this argument can prevail only if we agree with his contention, urged in Point I, above, that there was no independent evidence of his participation in the conspiracy other than the challenged statements of Thomas and Cipriano. Since we have concluded that there was sufficient independent proof of Boiardo's participation in the conspiracy, it follows that the motion for a judgment of acquittal was properly denied.

POINT IV
Under this point Boiardo asserts that the trial court erred in denying his motion for a severance since the joint trial with the other defendants made it impossible for him to call co-defendants Thomas and Cipriano as witnesses. He argues that his motion should have been granted because (1) the statements of Thomas and Cipriano testified to by Germano were inadmissible and a severance was essential to avoid his being prejudiced thereby, and (2) the rights of these co-defendants to remain silent and not testify prevented him from cross-examining them as to the truth of their statements. As to the premise of (1) we have held to the contrary above.
The issue here raised was considered and decided adversely to Boiardo's contention in State v. Manney, 26 N.J. 362 (1968), where the court said:
[T]here is a division of authority elsewhere on the question whether a severance should be ordered if one defendant plans to call another *234 as his witness. * * * Although a defendant is a competent witness, yet if called by a co-defendant at the latter's separate trial, he could decline to risk incrimination. It is difficult to conceive of a situation in which an accused would be willing to testify at such separate trial but not at a joint one. * * * We hesitate to say that in no situation will a separate trial be ordered, but surely the case would be a rare one. At any rate, there is nothing before us to suggest that either defendant takes the unlikely position that he will testify only upon a separate trial of the other. (at p. 369)
The cases cited by this defendant are not to the contrary. They contemplate a severance where evidence against one defendant implicates, but is not admissible against, a co-defendant. Such is not the situation here. Moreover, there is no indication in the record that Thomas and Cipriano would be willing to testify at a separate trial of Boiardo without declining to risk self-incrimination. We find no mistaken exercise of discretion in the trial court's denial of the motion for a severance.

POINT V
Defendant claims his right to be tried by an impartial jury was violated when the trial judge permitted two jurors upon whom bribe attempts had been made to remain on the jury. During the course of this six-week trial three of the 16 jurors impaneled to hear the case were approached by persons in attempts to influence their verdict. In each instance the juror immediately reported the incident to the judge who questioned each juror in camera and instructed him not to mention the matter to other jurors. In each case a hearing was conducted in open court, out of the presence of the other members of the jury, during which the juror related what had happened. In response to questions propounded by the judge each juror said that he could still sit on the jury and render a fair decision based on the law and evidence in the case. Defense counsel moved for a mistrial which was denied. After the charge to the jury and before 12 jurors were chosen to decide the case defense counsel moved to exclude the three jurors who had been approached. *235 The motion was denied, and two of the three jurors were selected to serve on the 12-member jury which thereafter deliberated and rendered the verdict.
Defendant contends that the trial judge failed to make a sufficient inquiry as to the impartiality of the three jurors and erred in refusing to exclude the jurors from the final jury of 12.
We are satisfied that the procedure followed by the trial judge was proper and that the defendants' right to a fair and impartial trial was fully protected. The jurors' responses to the court's questioning indicated affirmatively that the irregularity would not influence the verdict. See State v. Sachs, 69 N.J. Super. 566, 588 (App. Div. 1961). We conclude that the court's refusal to grant a mistrial or to remove the three jurors in question from the panel was not an erroneous exercise of discretion.

POINT VI
Boiardo argues that the court below erred in refusing to give a requested charge regarding evidence essential to proof of a conspiracy. The requested charge provided:
In determining whether or not a defendant was a member of a conspiracy, the jury are not to consider what others may have said or done. That is to say, the membership of a defendant in a conspiracy must be established by evidence as to his own acts and conduct, what he himself said or did.
The trial court did charge, in effect, that the declarations of any defendant could be considered against the others provided the jury found the conspiracy existed and they were all parties to it. This, we think, sufficiently implied that the jury should find the proviso to be a fact apart from the declarations before considering such declarations as evidential (assuming that as a matter of law the jury is required to make such a finding). It could therefore be fairly deemed that the intent of the requested charge was included in the court's charge to the jury.
*236 In any event, as seen above, under Point I-B, it is necessary for the State to submit proof independent of declarations of alleged co-conspirators of the existence of a conspiracy inclusive of defendant before such declarations are admissible against him. No New Jersey case has heretofore expressly considered the question whether, after the ruling of the trial judge admitting such declarations, the jury is required to reconsider the competency of the declarations, as, in effect, the charge sought by defendant here would require. The question is not free from difficulty. Consider Evidence Rule 8(1) and (2), dealing with the functions of judge and jury where admissibilty of evidence is dependent on a condition of fact, in the light of Evidence Rule 63(9) which deals with admissibility of declarations of co-conspirators. See also the extended dictum on the point by Judge Learned Hand in United States v. Dennis, 183 F.2d 201, 230-231 (2 Cir.1950).
We conclude that the sound and practical rule to be followed in relation to this particular problem is that adopted by the United States Second Circuit Court of Appeals. United States v. Stadter, 336 F.2d 326, 329-330 (1964); United States v. Stromberg, 268 F.2d 256, 265-266 (1959); and see United States v. Corallo, 413 F.2d 1306, 1324-1327 (2 Cir.1969).
The necessary preliminary findings, clearly justified by the proofs, having implicitly been made by the trial judge here, the denial of the charge sought by defendant was not error.

POINT VII
Finally, this defendant contends that the indictment should have been dismissed since his privilege against self-incrimination was violated when the federal agents were permitted to testify as to the results of their investigation of his alleged violations of the federal wagering tax laws or, in the alternative, that the evidence so obtained should have been suppressed.
*237 The point is clearly without merit. Our Supreme Court specifically considered the issues raised and decided them adversely to the defendant's position in State v. Gerardo, et al., 53 N.J. 261 (1969).

THE APPEALS OF ANDREW GERARDO, TOBY BOYD, LOUIS DI BENEDETTO, JOSEPH CIPRIANO, JOSEPH SARRECCHIA AND ANGELO SICA

POINT I
The defendants repeat the same grounds urged for reversal in Points I-VII of the brief submitted by Ruggerio Boiardo which we have fully discussed above.

POINT II
Defendants Gerardo, DiBenedetto, Sarrecchia and Angelo Sica allege that the court erred in denying their motions for a judgment of acquittal at the close of the case. They argue that if Germano's testimony about the statements made by Cipriano and Thomas is inadmissible the remaining evidence against them was insufficient to withstand their motions for acquittal. We have concluded that such testimony was admissible. (See Point I, Boiardo's appeal.) Moreover, from our view of the record there was sufficient evidence independent of such testimony to support the trial court's ruling.

POINT III
The defendants urge that we find reversible error in a lengthy hypothetical question propounded by the State to its gambling expert, Agent Siddall. The question is attacked as improper because it permitted the State to summarize its entire case in the presence of the jury and also because the answers invaded the jury's province as the ultimate finder of facts.
*238 We see no merit in either contention. The hypothetical question was long of necessity. "An expert cannot give an opinion without considering all the data, facts and circumstances pertinent to the inquiry being made." Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 144-145 (1950). Had it been less complete defendants would undoubtedly have objected to it as not embracing all the facts in evidence. See Evidence Rule 56(2).
Nor is expert opinion objectionable because it embraces the ultimate issue or issues to be decided by the trier of fact. Evidence Rule 56(3). Siddall was not asked his opinion of defendants' guilt, cf. State v. Landeros, 20 N.J. 69, 74 (1955), but was merely asked to characterize various activities based upon facts in evidence and his expertise in lottery operations. Those questions were properly the subject of expert opinion. See State v. Smith, 21 N.J. 326, 334 (1956); State v. Rucker, 46 N.J. Super. 162, 166 (App. Div. 1957); State v. Sachs, 69 N.J. Super. 566 (App. Div. 1961).
Defendants' reliance on State v. Sachs, supra, and State v. Vigliano, 50 N.J. 51 (1967) is misplaced. In Sachs the objectionable opinion concerned the defendants' physical control of football pool slips, a conclusion not dependent on peculiar knowledge or experience. In Vigliano the expert admitted that his opinion was "not probable," and thus merely speculative. Here Siddall's testimony cannot be dismissed as mere conjecture.

POINT IV
Defendants claim that the trial court erred in commenting favorably on the credibility of Germano as a witness both during summations and in its charge to the jury and thus denied defendants a fair trial.
In his summation to the jury Boiardo's attorney sought to attack Germano as being untrustworthy because he obtained the information to which he testified while serving as an undercover agent. When the prosecutor objected the *239 court said Germano "was doing his job as he was ordered to do and that was part of his job to detect violations of the law." Defendants moved for a mistrial which was denied. In its charge to the jury the court said:
Now, there was some comment about the propriety of the actions taken by the Federal officers, particularly about the propriety of the action taken by the agent, Germano. I might indicate to you that the actions that he took were lawful actions and under the direction of the authority of his government to become friendly and to learn what be could about this operation. So that you do not have for your consideration the propriety of his action but you do have for your consideration his ability to observe, his ability to recollect, the accuracy with which he observed and recollected, his ability and accuracy of testifying and the truth or accuracy of that with which he testified. That is your domain, but what he was doing was a lawful action and any comment of counsel to the contrary is not to be considered by you as motivating your decision. You only will consider, as I say, the truth or falsity of what he said, not the propriety of the action he took because he was performing his job.
We find no prejudicial error in either the comments of the court during counsel's summation or the charge to the jury. The court clearly left to the jury the issue of Germano's credibility as a witness.

POINT V
Defendants allege the court committed reversible error in its supplemental charge to the jury after the jury had been deliberating for over 18 hours during a period of three days. They argue that the charge was coercive and prejudicial, particularly in mentioning the obligation of a juror to give consideration to the views of his fellows and that a dissenting juror should reconsider whether his position is a reasonable one.
The charge given by the court was in essence the same as that approved in State v. Williams, 39 N.J. 471 (1963), cert. den. 374 U.S. 855, 83 S.Ct. 1924, 10 L.Ed.2d 1075 (1963), which was based on the charge upheld by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). It clearly instructed *240 the jurors that they should not compromise, divide, or yield their personal convictions for the purpose of arriving at an agreement. See State v. Williams, supra, 39 N.J. at 484.
There was no error in the supplemental charge. Moreover, the fact that the jury continued its deliberations for two more days after the charge was given bespeaks the absence of any coercion or prejudice.

POINT VI
Lastly, these defendants contend they were denied the effective assistance of counsel because of the trial court's comment to their attorneys, made out of the presence of the jury, that the attorneys were suspect in the jury tampering incidents which had occurred and would be subjected to an investigation at the conclusion of the trial. They argue that the statements were of such a serious nature as would unnerve counsel and prevent them from rendering effective assistance to the defendants.
We deem the argument to be frivolous. While the court's remarks may be criticized because of the absence of tangible evidence in the record of involvement by defense counsel, we are satisfied that defendants were not prejudiced thereby. All defense counsel were experienced in the trial of criminal cases. The record belies the argument that they were unnerved and thereafter rendered ineffective representation. Indeed, their continued combativeness throughout the trial, following the incident, completely negates the argument.

THE APPEALS OF THOMAS SPERDUTO, JOHN MALANGA, JULIA ORSI, MICHAEL MAIRONINO, CARMINE LIQUORI, MICHAEL DEL GUERCIO, MICHAEL RUSSOMANO, GERALDINO CUSTODI, NINO MACCIOLI AND NUNZIO SICA
These defendants raise the same grounds urged for reversal in Points I, II, V and VI in the Boiardo appeal and *241 Points III-VI referred to above in the appeal of Andrew Gerardo, et al., which we have already discussed.
In addition thereto Nunzio Sica contends the trial court erred in dismissing his motion for a judgment of acquittal of the three indictments charging him with conspiracy, keeping a place to which persons might resort for gambling, and possession of lottery paraphernalia. Although he concedes that the jury could find that the premises in question were being used as an office in which daily lottery bets were being tabulated, he argues that there was insufficient evidence to connect him to the lottery operation. We disagree.
The testimony by federal agents revealed that on numerous occasions several of the defendants were seen entering and leaving a one-family house at 15 Pershing Place in North Arlington carrying paper bags. A raid on the premises was conducted on February 2, 1969, and numerous items described as lottery paraphernalia were seized. Agent Anthracite testified that when he arrived on the premises he met Mrs. Pearl Gladys Sica, "who described herself to me as the owner of the residence and the wife of Nunzio Sica." See Evidence Rule 63(4) (b).
We think that from the declarations of marital status and ownership made by Mrs. Sica the jury could reasonably infer that Nunzio Sica had possession and control of the premises and of the contraband seized therein, State v. Puryear, 94 N.J. Super. 125, 132 (App. Div. 1967), rev'd. on other grounds, 52 N.J. 81 (1968), and that he must have known and approved of the lottery activities regularly conducted there. Consequently there was no error in the court's refusal to grant Nunzio Sica's motions for a judgment of acquittal.
We also see no merit to Nunzio Sica's contention that the prosecutor in summation unfairly attempted to link him to Angelo Sica and Louis DiBenedetto through a reference to their common defense counsel. It is apparent *242 that the prosecutor was simply identifying the defendants for the benefit of the jury. The remark was not prejudicial.

THE APPEAL OF CESAR CERATO

POINT I
This defendant also relies on Points I, IV, V, VI and VII urged for a reversal in Boiardo's appeal which we have already discussed in this opinion.

POINT II
He also contends that his motion for a judgment of acquittal should have been granted because there was insufficient evidence that he was a party to the conspiracy and, further, that the verdict of the jury was contrary to the weight of the evidence.
The undisputed evidence shows that on ten separate occasions between November 14, 1966 and January 30, 1967 Cerato was present in the Ben Thomas Luncheonette in the company of other conspirators. On one occasion he was observed giving Toby Boyd a sum of money. Germano himself placed a lottery bet with Cerato, and saw Thomas place bets with him.
Defendant attempts to exculpate himself by claiming the evidence showed that he was not involved in the Newark conspiracy but was a member of a "Jersey City outfit," a "renegade" who did not work for the Newark organization. However, as stated above, it is undisputed that he took lottery bets at the luncheonette, that he needed Boiardo's permission to operate, and that Boiardo "gets a percentage of this action."
We are satisfied that the evidence and the logical inferences to be drawn therefrom required a denial of his motion for acquittal and that there was sufficient proof for the jury to find that Cerato conspired with the other defendants to violate the lottery laws of this State.

*243 THE APPEAL OF BENJAMIN THOMAS
Thomas contends there was erroneous exercise of discretion when the trial court refused to grant a severance following his hospitalization at the outset of the trial. We agree and reverse his conviction.
During the jury selection process Thomas collapsed and was taken by ambulance to a Newark hospital. The trial court was informed of his illness and hospitalization but refused to grant a severance or continuance. Thereafter Thomas' counsel called Dr. Frederick Cohen, who testified that Thomas was very ill from a urinary infection, that he may have had a heart attack, and that he could not safely attend the trial for at least four weeks. The State admitted that it had no evidence to counter the testimony of Dr. Cohen, and it offered the medical report and affidavit of Dr. Martin Jassie, who had examined Thomas at the State's request. While doubting that Thomas had suffered a heart attack, Dr. Jassie concluded that "Mr. Thomas is currently too ill to stand trial, * * *" and that "postponement of his trial is necessary and it may easily require a month or more." The trial court still refused to grant a severance, ruling that Thomas' absence was voluntary and that his trial would continue without him. Thomas remained absent throughout the trial, appearing only on one occasion at the end of the case following a court order threatening bail forefeiture.
The granting of a continuance for health reasons is a matter ordinarily within the discretion of the trial court. State v. Kaiser, 74 N.J. Super. 257, 271 (App. Div. 1962), certif. den. 38 N.J. 310 (1962), cert. den. 376 U.S. 950, 84 S.Ct. 966, 11 L.Ed.2d 970 (1963). Among the factors to be evaluated by the court in the exercise of its discretion are (1) medical reports, (2) personal observations of the accused, (3) the effect of a continuance upon the State's ability to present evidence, and (4) whether or not the accused will be better able to stand trial at a later date. Id. The trial court must always be mindful of the accused's *244 constitutional right to be present in the court room at every stage of his trial. See Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057 25 L.Ed.2d 353 (1970).
Here there was uncontroverted expert medical opinion that Thomas was too ill to stand trial. Clearly his absence could not be considered voluntary. Moreover, there was no reason to believe that he would not subsequently be available for trial; nor was there any indication that a delay in his trial would be prejudicial to the State in producing evidence. We conclude that the trial court's refusal to grant Thomas' motion for a severance was a mistaken exercise of its discretion.

CONCLUSION
For the reasons expressed above the convictions of all defendants, with the exception of Benjamin Thomas, are affirmed. The conviction of Thomas is reversed, and his case is remanded for a new trial.